IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TAMMY L. STAFFORD          )
                           )
v.                         )          No. 3:10-0766
                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security )

To: The Honorable Thomas A. Wiseman, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform unskilled and limited medium work (tr. 21-22) during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) should be denied.

# I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on February 9, 2007, alleging a disability onset date of November 15, 2005, due to "[b]ipolar manic depression, panic attacks, anxiety attacks, L2 arthritis in back, migraine headaches, [and] seizures." (Tr. 122-35, 164.) Her applications were denied initially and upon reconsideration. (Tr. 85-93.) A hearing before Administrative Law Judge ("ALJ") Barbara Kimmelman was held on October 19, 2009. (Tr. 29-76.) The ALJ issued an unfavorable decision on November 19, 2009 (tr. 10-23), and the plaintiff sought review by the Appeals Council. (Tr. 6.) On June 24, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on September 18, 1976, and was 29 years old as of November 15, 2005, her alleged onset date. (Tr. 122.) She has a ninth grade education and worked as a cashier, home attendant, laundry worker, nurses aid, and waitress. (Tr. 35, 165.)

## A. Chronological Background: Medical Records

The plaintiff was hospitalized at UMC McFarland, a psychiatric facility, in October 2001, and within three weeks after her discharge, she was again hospitalized on November 7, 2001. (Tr. 228-38.) At the time of her admission in November of 2001, her complaints included suicidal ideation, homicidal ideation, hallucinations, and depression. (Tr. 236.) Dr. George G. Paz, a psychiatrist, examined the plaintiff and noted that her mood was depressed and irritable, that her concentration was fair, and that her insight and judgment were poor. (Tr. 236-37.) Dr. Paz

diagnosed the plaintiff with "bipolar mood disorder, depressed"[1] and assigned her a GAF score of 25.[2] The treatment plan included resuming her prior medication, specifically, Geodon,[3] Remeron,[4] Prozac,[5] and Klonopin,[6] monitoring her suicidal ideation, depression, homicidal ideation and psychosis, and her engaging in group therapy. Dr. Paz estimated that she would be hospitalized for 7-10 days (*id.*), but it is not clear when she was discharged.

Between March of 2004 and July of 2005, the plaintiff presented to Dr. Jawaid Ahsan, a neurologist with Sumner Neurology Associates, on several occasions with complaints of seizures. (Tr. 241-50.) Dr. Ahsan opined that the plaintiff was alert and oriented; that her mood, concentration, and reasoning were normal; and that she had no hallucinations or delusions. (Tr. 249.) He determined that her strength was five out of five in her lower and upper extremities; diagnosed

---

[1] Dr. Paz noted in the plaintiff's psychiatric history that the November 7, 2001, hospitalization was her third psychiatric hospitalization and that she had attempted suicide at the age of 14. (Tr. 236.)

[2] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score of 21-30 falls within the range of "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment [or] inability to function in almost all areas." *Id.*

[3] Geodon is prescribed for schizophrenia and manic episodes of bipolar disorder. Saunders Pharmaceutical Word Book 318 (2009) ("Saunders").

[4] Remeron is a tetracylic antidepressant. Saunders at 609.

[5] Prozac is a selective serotonin reuptake inhibitor prescribed for major depressive disorder. Saunders at 591.

[6] Klonopin is prescribed for panic disorder. Saunders at 391.

-3-

her with "seizure disorder complex partial type," bipolar disorder, and migraine headaches; and prescribed Lamictal,[7] Depakote,[8] and Effexor.[9] (Tr. 242, 244, 249-50.)

On March 10, 2004, the plaintiff presented to the Emergency Room at Trousdale Medical Center ("TMC") with complaints of seizures and tremors. (Tr. 382.) Dr. Bien Samson, a general practitioner and general surgeon, examined the plaintiff, noted that she was slow to answer questions, and opined that she was having a reaction to Lamictal. (Tr. 383.) On March 27, 2004, the plaintiff returned to the Emergency Room at TMC with complaints of seizures and panic attacks. (Tr. 377.) She had two seizures that day, was diagnosed with "drug withdrawal" from Xanax, and was prescribed Xanax.[10] Between March and August of 2004, the plaintiff presented to the TMC Emergency Room on several occasions with complaints of seizures, tremors, migraines, panic attacks, head and right leg lacerations, and a spider bite. (Tr. 359-88.) She was diagnosed with anxiety, bipolar disorder, drug withdrawal, right leg and forehead lacerations, migraine headaches, a seizure disorder, and a spider bite, and was prescribed Xanax, Effexor, Geodon, Klonopin, Depakote, Medrol Dosepak,[11] Augmentin,[12] Benadryl.[13] (Tr. 341-88.)

---

[7] Lamictal is an antiepileptic drug prescribed for bipolar disorder and mood episodes. Physicians Desk Reference 1426 (65th ed. 2011) ("PDR").

[8] Depakote is prescribed to treat seizures, manic episodes of bipolar disorder, and migraines. Saunders at 210.

[9] Effexor is prescribed for the treatment of major depressive disorder. Saunders at 255.

[10] Xanax is a sedative that is used to treat panic disorders and angoraphobia. Saunders at 768.

[11] Medrol Dosepak is prescribed as an anti-inflammatory. Saunders at 433.

[12] Augmentin is oral antibacterial medication. Saunders at 71.

[13] Benadryl is an antihistamine. Saunders at 86.

-4-

Between September of 2005, and October of 2007, the plaintiff presented to Dr. Samson on multiple occasions with complaints of left flank pain, seizures, heart palpitations, and lower back pain. (Tr. 331-53.) An MRI of the plaintiffs lower spine revealed "mild facet arthritic changes . . . at the L4-5 and L5-S1 disc levels" (tr. 272), and Dr. Samson diagnosed her with chronic lower back pain, seizure disorder, migraines, palpitations, and left flank pain. (Tr. 331-53.) Dr. Samson prescribed Prozac, Dilantin,[14] Lortab,[15] and Soma.[16] *Id.*

On May 30, 2007, the plaintiff presented to Dr. Albert J. Gomez with complaints of chronic neck pain and lower back pain. (Tr. 278-79.) Dr. Gomez noted that there was "moderate tenderness to palpation" of the plaintiff's cervical spine and lower back and that although her lower back had a full range of motion, her cervical spine had a decreased range of motion. (Tr. 278.) Dr. Gomez diagnosed her with chronic neck pain and chronic lower back pain. (Tr. 279.)

On June 29, 2007, the plaintiff presented to Dr. Bill Davis, Psy.D., at Cumberland Mental Health Services of the Volunteer Behavioral Health Care System ("VBHCS") "to address daily problems with mood liability and anxiety." (Tr. 259-271.) Dr. Davis examined the plaintiff and noted that her mood and appearance were appropriate, that her memory and concentration were fair, and that her level of insight, judgment, and impulse were fair. (Tr. 267-68.) He diagnosed the plaintiff with mood disorder not otherwise specified ("NOS"), anxiety disorder NOS, seizure disorder, migraines, heart palpitations, chest pain, and lower back arthritis. (Tr. 268.) Dr. Davis also completed a Tennessee Clinically Related Group ("CRG") assessment and opined that the plaintiff's

---

[14] Dilantin is an anticonvulsant. Saunders at 227.

[15] Lortab, also known as Hydrocodone, is a narcotic painkiller and fever reducer. Saunders at 415.

[16] Soma is prescribed as a skeletal muscle relaxant. Saunders at 653.

-5-

activities of daily living, ability to adapt to change, concentration, task performance, and pace were moderately limited and that her interpersonal functioning was markedly limited. (TR. 260-62.) He assigned the plaintiff a GAF score of 40[19] and classified her as a person with a "Severe and Persistent Mental Illness." *Id.* A severe and persistent mental illness was defined as "recently severely impaired" with the severity of the impairment having lasted for "six months or longer of the past year." (Tr. 262.)

On July 2, 2007, Dr. Carol Kossman, a non-examining DDS consultant, completed a physical Residual Functional Capacity ("RFC") assessment (tr. 280-87) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 281.) She found that in an eight hour workday the plaintiff could stand/walk and sit about six hours, was unlimited in her ability to push/pull, could frequently stoop, kneel, crouch, and crawl, and could occasionally climb and balance. (Tr. 282.) Dr. Kossman noted that the plaintiff should "avoid even moderate exposure" to wetness and hazards and that "[f]ully credible neck, back and head pain preclude heavy work." (Tr. 284-85.)

On August 15, 2007, Dr. Linda Blazina, Ph.D., a consultative DDS psychologist, examined the plaintiff (tr. 288-94) and noted that she related that she was anxious and depressed, had difficulty concentrating, and had a lack of interest in activities. (Tr. 289.) Dr. Blazina opined that the plaintiff was oriented to time, person, place, and circumstances; that her "immediate memory functioning and her learning abilities were below average;" that her recent and long term memory functioning were "adequate;" that her attention and concentration skills "were below average;" and that her

---

[19] A GAF score of 31-40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV-TR at 34.

intellectual functioning was "estimated to be in the low average to possibly average range." (Tr. 289-90.) The plaintiff reported that she drives, shops, performs household chores when she is "'not either hurting or crying,'" and prepares simple meals. (Tr. 291.)

Dr. Blazina concluded that the plaintiff's ability to understand and remember short simple instructions is not noticeably impaired, that her ability to remember detailed instructions and to sustain concentration and persistence is moderately impaired due to anxiety and depression, that her "social interaction abilities" are not noticeably impaired, and that "[h]er ability to adapt to changes in a work routine and tolerate normal workplace stress" is moderately impaired. (Tr. 292.) Dr. Blazina diagnosed the plaintiff with "major depressive disorder, recurrent, moderate with psychotic features," panic disorder without agoraphobia, seizure disorder, migraines, back and neck pain, degenerative disk disease, and arthritis, and assigned her a GAF score of 70 to 75.[20] Id.

On August 29, 2007, Dr. Victor L. O'Bryan, Ph.D., a non-examining consultative DDS psychologist, completed a mental RFC assessment (tr. 295-98) and opined that the plaintiff was markedly limited in her "ability to interact appropriately with the general public" and was moderately limited in her ability to carry out detailed instructions, in her "ability to maintain attention and concentration for extended periods of time," in her "ability to perform activities within a schedule," in her "ability to work in coordination with or proximity to others without being distracted by them," in her "ability to complete a normal workday and workweek," in her "ability

---

[20] A GAF score of 61-70 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34. A GAF score of 71-80 falls withing the range of "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning." Id.

-7-

to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and in her "ability to respond appropriately to changes in the work setting." (Tr. 295-96.) Dr. O'Bryan concluded that the plaintiff could do "lower level detailed work," could not work with the public, "should work in settings with limited social exposure," and could "adapt to mild levels of stress and change." (Tr. 297.) Dr. O'Bryan also completed a Psychiatric Review Technique Form ("PRTF") (tr. 299-312) and diagnosed the plaintiff with major depressive disorder and panic disorder. (Tr. 302, 304.) He concluded that she had moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decomposition. (Tr. 309.)

On November 2, 2007 the plaintiff presented to Dr. Ahsan complaining of reoccurring seizures and he noted that the strength in her upper and lower extremities was a five out of five. (Tr. 390-91.) Dr. Ahsan diagnosed the plaintiff with partical epilepsy and migraines, and he prescribed Dilantin and Lamotrigine.[21] (Tr. 391.)

On January 17, 2008, Dr. Lloyd A. Walwyn, a nonexamining DDS consultant, completed a physical RFC assessment (tr. 393-400) and found that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 394.) He opined that in an eight hour workday the plaintiff could stand/walk and sit about six hours, was unlimited in her ability to push/pull, could frequently stoop, kneel, crouch, and crawl, and could occasionally climb and balance. (Tr. 394-95.) Dr. Walwyn noted that the plaintiff should "avoid all exposure" to hazards and noted that her impairments "could reasonably be expected to cause her stated level of pain and limit her in her

---

[21]Lamotrigine is an anticonvulsant. Saunders at 396.

-8-

function as she described in her ADLs [activities of daily living] . . . [and that her] symptoms are credible." (Tr. 397, 400.)

On January 30, 2008, Dr. Frank D. Kupstas, a nonexamining consultative DDS psychologist, completed a PRTF (tr. 401-14) and diagnosed the plaintiff with "MDD [major depressive disorder] vs mood d/o [disorder]" and "panic d/o [disorder] vs anxiety d/o [disorder]." (Tr. 404, 406.) He concluded that she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation. (Tr. 411.) Dr. Kupstas noted that the plaintiff had symptoms of anxiety and depression that were "possib[ly] bad" but were "currently maintained on" prescription medication, that she was "able to perform a wide range of ADLs [activities of daily living] independently," and that her limitations "appear to be generally credible." (Tr. 413.)

Dr. Kupstas also completed a mental RFC assessment (415-18) and opined that the plaintiff was moderately limited in her ability to understand and remember detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to work in coordination with or proximity to others without being distracted by them;" in her "ability to complete a normal workday and workweek;" in her "ability to interact appropriately with the general public;" in her "ability to accept instructions and respond appropriately to criticism from supervisors;" and in her "ability to respond appropriately to changes in the work setting." (Tr. 415-16.)

Between January of 2008, and August of 2009, the plaintiff returned to Dr. Samson on several occasions with complaints of "back trouble," seizures, and head and chest congestion. (Tr. 420-25.) An MRI of the plaintiff's lumbar spine revealed "[n]o disc herniation or canal

-9-

stenosis" in her lower back but showed "some focal disc bulging or disc herniation" in her thoracic spine. (Tr. 435.)   Dr. Samson diagnosed the plaintiff with seizure disorder, lower back pain, degenerative disc disease, migraines, anxiety, and depression, and prescribed Clonazepam,[22] Alprazolam,[23] Prozac, Neurontin,[23] and a Z-pack. *Id.*  Between February of 2008, and May of 2009, the plaintiff presented to the TMC Emergency Room on two occasions and to the outpatient clinic on four occasions and was diagnosed with seizure disorder, dyspnea, and anxiety disorder and prescribed Dilantin and Neurontin. (Tr. 445-96.)

On September 22, 2009, Dr. Samson completed a Medical Source Statement for Social Security Disability Claim ("Medical Source Statement") (tr. 429-30) and diagnosed the plaintiff with seizure disorder, migraines, chronic low back pain, insomnia, and anxiety disorder.[24] (Tr. 429.) Dr. Samson found that the plaintiff could lift five pounds occasionally; could stand and sit for four hours in a workday and for one hour at a time; could work for two hours in a workday; could never bend, stoop, balance, perform fine manipulations with either hand, perform gross manipulation with her left hand, work around dangerous equipment, operate motor vehicles, or tolerate heat, dust, smoke, fumes, or exposure to noise. *Id.*  Dr. Samson also determined that the plaintiff could occasionally perform gross manipulations with her right hand, raise both arms over shoulder level, and tolerate cold; that she needs to elevate her legs frequently during an eight hour workday; that

---

[22] Clonazepam is an anticonvulsant prescribed for panic disorders and manic episodes of bipolar disorder. Saunders at 169-70.

[23] Alprazolam is a sedative used to treat panic disorders and agoraphobia. Saunders at 33.

[23] Neurontin is used as an "anticonvulsant for partial-onset seizures" and to treat nerve pain. Saunders at 488.

[24] Although in March of 2007, Dr. Samson advised that he does not perform "disability testing" (tr. 277), he completed both physical and psychological Medical Source Statements in 2009.

she suffers from severe pain which frequently interferes with her attention and/or concentration; and that due to her impairments she should be expected to miss four days or more of work a month. (Tr. 430.)

Additionally, Dr. Samson completed a Medical Statement Concerning Psychological Impairment(s) for Social Security Disability ("Psychological Medical Statement") (tr. 431-33) and noted that the plaintiff had mild disturbance in appetite, "[p]sychomotor agitation or retardation," and "[h]allucinations, delusions or paranoid thinking;" moderate anhedonia, suicidal ideation, motor tension, automatic hyperactivity, apprehension, "vigilance and scanning," and "[p]ersistent irrational fear of a specific object;" and marked sleep disturbance, decrease in energy, feelings of guilt, difficulty concentrating, persistent anxiety, and recurrent severe panic attacks, obsession or compulsion, and "recollections of a traumatic experience, which are a source of marked distress." (Tr. 431.) Dr. Samson found that the plaintiff had mild restriction of activities of daily living and marked difficulty in maintaining social functioning. (Tr. 432.)

Dr. Samson concluded that the plaintiff was markedly impaired in her "ability to remember locations and work like procedures;" in her ability to remember and understand short and simple instructions and detailed instructions; in her "ability to carry out very short and simple instructions;" in her "ability to maintain attention and concentration for extended periods;" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" in her "ability to sustain an ordinary routine without special supervision;" in her "ability to work in coordination with and proximity with others without being distracted by them;" in her "ability to make simple work-related decisions;" in her "ability to ask simple questions or request assistance;" in her "ability to accept instructions and respond appropriately to criticism from

supervisors;" and in her "ability to be aware of normal hazzards and take appropriate precautions."
(Tr. 432-33.)  He also found that the plaintiff was extremely impaired in her "ability to carry out
detailed instructions;" in her "ability to complete a normal workday and workweek;" in her "ability
to interact appropriately with the general public;" in her "ability to get along with coworkers or peers
without distracting them or exhibiting behavioral extremes;" in her "ability to maintain socially
appropriate behavior and to adhere to basic standards of neatness and cleanliness;" in her "ability
to respond appropriately to changes in the work setting;" in her "ability to travel in unfamiliar places
or use public transportation;" and in her "ability to set realistic goals or make plans independently
of others." *Id.*

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by a non-attorney advocate, and
the plaintiff and Gail Dittmore, a vocational expert ("VE"), testified. (Tr. 30-79.)  The plaintiff
testified that she had a ninth grade education and is able to drive but was advised by her doctors not
to drive since she suffers from seizures. (Tr. 35.)  She related that she had worked as a packager, on
an assembly line putting together doors, and at a nursing home, but that she lost her jobs due to her
seizures, her absenteeism caused by visiting doctors for her seizures, and her back problems. (Tr. 37-
39.)

The plaintiff testified that she occasionally shops, does not do housecleaning, and receives
help from her fiance's mother when cooking. (Tr. 40, 50.)  She related that she is able to lift five to
ten pounds occasionally, that numbness in her left arm makes it difficult for her to grip things, that
she can sit for thirty minutes and stand for thirty minutes to one hour, that she is only able to work

-12-

"[j]ust a couple" of hours a day, that in an eight hour workday she is only able to stand two to three hours and sit for two hours, and that she has difficulty concentrating due to anxiety and panic attacks. (Tr. 42, 46.) The plaintiff testified that she has been diagnosed with "bipolar manic depressive psychotic episodes, anxiety, and depressive disorder;" that her lower back pain "protrudes to other areas;" and that she was prescribed Prozac, Xanax, and Clonazepam for her seizures and nightmares and Hydrocodone and Soma for her back problems. (Tr. 43, 45, 47.) The plaintiff described her pain as a five out of ten when she takes her medication; explained that her medication makes her tired, nauseous, drowsy, and fatigued; and related that she uses a heating pad for pain relief. (Tr. 48.)

The plaintiff testified that she "doubts" that she could work in close proximity to other people because she gets "really nervous and upset around them;" that she does not respond well to criticism; that she has stress induced panic attacks; and that although Xanax helps reduce her anxiety, she still has "two or three panic attacks a day." (Tr. 51-53.) She related that between 2005 and 2007, she had seizures "every once in a while," that she stopped taking her medication at times because of the side effects she experienced, such as migraines, and that Dr. Samson told her that "there [are] very few seizure medications that [her] body will accept." (Tr. 55-57.)

The VE confirmed that her testimony would be consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 64.) The VE classified the plaintiff's past work as a payroll clerk as sedentary and semi-skilled, as a data-entry clerk as sedentary and semi-skilled, as a homemaker as medium and semi-skilled, as a laundry worker as medium and unskilled, as a nurse's aid as heavy and semi-skilled, and as a waitress as light and semi-skilled. (Tr. 66.) The ALJ asked the VE what type of work the plaintiff could perform if she could lift fifty pounds occasionally and twenty-five

-13-

pounds frequently; could sit/stand or walk "for up to six hours each in an eight hour work day;" could "occasionally perform all postural activities but never climb ladders, ropes or scaffolds;" "would be limited to short, simple, routine tasks not working with the public and only occasionally working with co-workers;" and should avoid working "around pulmonary irritants and would have to observe seizure precautions as not working around heights, moving machinery or operating motor vehicles." (Tr. 66-67.) The VE answered that the plaintiff could perform her past work as a laundry worker[25] and that she could also work as an assembler at the medium and unskilled levels, as a sorter at the medium and unskilled levels, and as a food preparation worker at the medium and unskilled levels. (Tr. 67.)

Next, the ALJ asked the VE what type of work the plaintiff could perform if she could lift ten pounds; could sit/stand or walk "for three hours each in an eight hour work day but only 30 minutes at one time;" could "occasionally perform postural activities but never climb ladders, ropes or scaffolds;" "should not work around pulmonary irritants or [sic] and would have to observe seizure precautions so no heights, moving machinery or driving any motor vehicles;" and "would be limited to short, simple, routine tasks not working with the public and only occasionally working with co-workers." (Tr. 68.) The VE answered that the plaintiff could work as a surveillance system monitor at the sedentary and unskilled levels and as an office clerk as the sedentary and unskilled levels. *Id.* The ALJ also asked the VE what type of work the plaintiff could perform if she could lift five pounds occasionally and could stand/sit "for 60 minutes at one time for a total of four hours

_____

[25] Even though the VE determined that the plaintiff could return to her past job as a laundry worker, the ALJ made a step four determination that the plaintiff was not able to return to her past relevant work (tr. 21) but then at step five she included the laundry worker job in the list of possible jobs that her RFC allowed her to perform. (Tr. 21-22.)

-14-

in an eight hour work day." *Id.* The VE replied that the plaintiff could work as a surveillance system monitor but not as an office clerk. *Id.* The VE testified that if the plaintiff "was precluded from doing any stooping and any manipulations with either hand" that she would be not be able to work and that the job market typically allows an individual to miss two or three days of work per month at the most. (Tr. 69.)

The plaintiff's representative asked the ALJ to consider what type of work the plaintiff could perform if she has "no useful function" interacting with the general public, getting along with co-workers, maintaining socially appropriate behavior, or responding to changes in the work setting. (Tr. 73.) The VE answered that the plaintiff would be precluded from working. (Tr. 74.) Next, the plaintiff's representative asked the VE what type of work the plaintiff could perform if she could lift ten pounds occasionally and walk/sit for a total of two hours in an eight hour workday and if she suffered from fatigue that required her to take two to three naps a day that lasted from thirty minutes to three hours. *Id.* The VE testified the plaintiff's need for naps would preclude her from working. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on October 8, 2009. (Tr. 13-23.) Based on the record, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2006.

2.   The Claimant has not engaged in substantial gainful activity since November 15, 2005, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

* * *

-15-

3.    The claimant has the following severe impairments: major depressive disorder, moderate with psychotic features; panic disorder; osteoarthritis of the lumbar spine; and a seizure disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

* * *

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can sit for six hours in an eight hour workday, stand for six hours in an eight hour workday, and walk for six hours in an eight hour work day. The claimant can never climb ladders, ropes, and scaffolds. She can perform all other postural activities occasionally. She can have no exposure to pulmonary irritants. She can perform only short, simple, or routine tasks. She can not work with the public but can have occasional contact with co-workers. She requires the ability to follow seizure precautions, including avoiding heights, moving machinery, and operating motorized vehicles and equipment.

* * *

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.    The claimant was born September 18, 1976 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964)

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a

-16-

framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a), 416. 969, and 416.969(a)).

\* \* \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2005 through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-23.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). *See also Parks v. Soc. Sec. Admin.*, 413 Fed. Appx. 856,

-17-

864 (6th Cir. Mar. 15, 2011) ("In order to affirm the Commissioner's decision, we need not "agree with the Commissioner's finding, as long as it is substantially supported in the record.") (quoting *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity

-18-

is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

-19-

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris*

-20-

*v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 21-22.) At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 15.) At step two, the ALJ determined that the plaintiff's major depressive disorder, moderate with psychotic features; panic disorder; osteoarthritis of the lumbar spine; and seizure disorder were severe impairments. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 16.) At step four, the ALJ determined that the plaintiff was not able to perform her past relevant work but that she had an RFC to perform a limited range of medium work. (Tr. 21-22.) As step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a sorter, assembler, laundry worker, and food preparation worker. (Tr. 22-23.)

**C. The Plaintiff's Assertions of Error**

The plaintiff asserts that the ALJ improperly rejected the opinion of her treating physician and failed to provide good reasons for doing so (Docket Entry No. 12, at 10-17), and that the VE relied on inaccurate hypotheticals since the ALJ did not properly describe the findings of three DDS psychologists to the VE. Docket Entry No. 12, at 17-22.

### 1. The ALJ properly assigned "little weight" to the findings of the plaintiff's treating physician.

The plaintiff contends that the ALJ erred in assigning "little weight" to Dr. Samson's Medical Source Statement and Psychological Medical Statement and failed to provide sufficient reasoning for that determination. Docket Entry No. 12, at 10-17. Given the regularity with which Dr. Samson examined the plaintiff (tr.331-53, 420-35), he is classified as a treating source under 20 C.F.R. §§ 404.1502 and 416.902.[26] Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Generally, an ALJ is required to give

---

[26] A treating source, defined by 20 C.F.R. §§ 404.1502 and 416.902, is your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

-22-

"controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not assign controlling weight to Dr. Samson's Medical Source Statement or Psychological Medical Statement. (Tr. 20-21.) As the plaintiff correctly points out, even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the

-23-

weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)), and so that the plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The ALJ focused on the factors of supportability, consistency, and specialization of the physician in assigning little weight to Dr. Samson's Medical Source Statement and Psychological Medical Statement. In evaluating Dr. Samson's Medical Source Statement, the ALJ explained that

> [t]he undersigned affords little weight Dr. Samson's assessment of the claimant's physical abilities, as they are internally inconsistent and not consistent with or supported by his treatment records or the record as a whole. He lists her diagnoses as seizure disorder, migraine, chronic low back pain, insomnia, and anxiety disorder. He then suggests that the claimant can lift only 5 pounds occasionally and no weight frequently, without any specific explanation or rationale. However, objective medical evidence and treatment notes do not support these restrictions. He suggests that the claimant can only work 2 hours in an 8-hour workday, but also indicated that she can stand for 4 hours (60 minutes at one time) and sit for 4 hours (60 minutes at one time) in an 8-hour workday. Dr. Samson also suggests a number of other strict limitations regarding postural activities, manipulative activities, and environmental exposure. He suggests that she could be expected to miss work 4 or more days in a month. Although Dr. Samson is a treating individual, he is not a specialist and instead is a general practitioner. The record as a whole does not support the limitations he suggests and it appears to be based on the claimant's reports. Additionally, although the claimant testified that he mentioned doing so, there is no evidence to suggest that Dr. Samson referred the claimant to a specialist for her back problems, which renders his assessments even less persuasive because they conflict with his own course of treatment. Instead, the opinions of the State agency sources are credited as they are consistent with and supported by the record as a whole.

Tr. 20-21 (internal citations omitted).

On September 22, 2009, Dr. Samson completed a Medical Source Statement (tr. 429-30) and diagnosed the plaintiff with seizure disorder, migraines, chronic low back pain, insomnia, and anxiety disorder. (Tr. 429.) He determined that she could lift five pounds occasionally; could sit/stand for four hours total and one hour consecutively in a workday; could work for two hours

-24-

total in a workday; could never bend, stoop, balance, perform fine manipulations with either hand, perform gross manipulation with her left hand, work around dangerous equipment, operate motor vehicles, or tolerate heat, dust, smoke, fumes, or exposure to noise; and could be expected to miss up to fours days or more of work a month. (Tr. 429-30.)

Although Dr. Samson's Medical Source Statement indicates that the plaintiff's physical impairments significantly affected her ability to function, his treatment notes from September of 2005, to October of 2007 (tr. 331-53), and from January of 2008, to August of 2009 (tr. 420-25), do not indicate that level of severity. Dr. Samson repeatedly diagnosed the plaintiff with lower back pain, seizure disorder, and migraines but his treatment plan remained largely unchanged over the three years he examined the plaintiff. (Tr. 331-53, 420-25.) Additionally, as the ALJ pointed out, the objective record medical evidence does not support the findings in Dr. Samson's Medical Source Statement. (Tr. 20.) MRIs from September of 2005, and from March of 2008, both requested by Dr. Samson, revealed that the plaintiff only had "mild facet arthritic changes . . . at the L4-5 and L5-S1 disc levels" and "[n]o disc herniation or canal stenosis" in her lower back but had "some focal disc bulging or disc herniation" in her thoracic spine.[27] (Tr. 272, 435.) Lastly, the ALJ noted that Dr. Samson was not a "specialist" and was only a "general practitioner," but this rationale does not

_____

[27] The plaintiff argues that the Sixth Circuit in *Rogers* "determined that [the ALJ's] referencing a lack of objective findings did not provide for sufficient justification for rejection of the treating source opinion" and thus the ALJ's "decision did not meet the requirements of 20 C.F.R. Section 404.1527." Docket Entry No. 12, at 15. However, the plaintiff's impairment in *Rogers* was fibromyalgia and the Court was not simply taking issue with the ALJ's reliance on objective medical evidence to undercut the findings of the treating source. 486 F.3d at 245. Rather the Court recognized the difficulty that fibromyalgia and its phantom-like symptoms pose to physicians and concluded that "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Id.*

Case 3:10-cv-00766   Document 17   Filed 09/07/11   Page 25 of 31 PageID #: 107

carry much weight since Dr. Kossman and Dr. Walwyn, the DDS physicians to whom the ALJ assigned significant weight, were not specialists. (Tr. 20, 280-87, 393-400.)

Additionally, in evaluating Dr. Samson's Psychological Medical Statement, the ALJ explained that

> [t]he undersigned also affords little weight to the opinion of Dr. Samson's assessment of the claimant's mental abilities. Dr. Samson suggests that the claimant has deficiencies of concentration, persistence or pace resulting in frequent failures to complete tasks in a timely manner. He also suggests that she has repeated episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from the situation or experience an exacerbation of signs and symptoms.[28] Additionally, he suggests that she has complete inability to function outside of the area of her home due to panic attacks. He also suggests marked or extreme limitations in all of the subcategories he assessed related to carrying out tasks, maintaining attention and concentration, interacting with others, and adapting to changes in a work setting. Dr. Samson is not a mental health specialist, and instead is a general practitioner. Dr. Samson's assessments appear to be based on the claimant's subjective reports, are not supported by his own treatment notes, and are inconsistent with the record as a whole. Furthermore, despite suggesting limitations suggesting debilitating mental illness, the record does not indicate that Dr. Samson has referred the claimant to a mental health professional. This renders the assessment even less persuasive. Instead, the opinions of the State agency mental health sources are credited, as they are consistent with and supported by the record as a whole.

Tr. 21 (internal citations omitted).

The ALJ's rationale for ascribing little weight to Dr. Samson's Psychological Medical Statement mirrors her reasoning for discounting the physical restrictions Dr. Samson assigned to the plaintiff. Dr. Samson determined that the plaintiff was markedly or extremely limited in all 20 "Work Limitations Related to Mental Status" categories (tr. 432-33), but his treatment notes from September of 2005, to October of 2007, and from January of 2008, to August of 2009, do not show

---

[28] As the ALJ noted, nothing in Dr. Samson's treatment notes or elsewhere in the record supports his conclusion of such deterioration or decompensation of any extended duration. (Tr. 17.)

-26-

or indicate the same degree of severity. (Tr. 331-53, 420-25.)  Dr. Samson diagnosed the plaintiff

with migraines, anxiety, and depression (tr. 331-53, 420-25) but, again, his treatment plan remained

largely unchanged over the three years he examined the plaintiff. (Tr. 331-53, 420-25.)  Further, as

noted by the ALJ, Dr. Samson is not a mental health professional and he never referred the plaintiff

to a mental health specialist, and for the most part, psychologists Dr. Davis, Dr. Blazina,

Dr. O'Bryan, and Dr. Kupstas, those mental health specialists who evaluated the plaintiff's mental

impairments, found her to be mildly to moderately limited by her mental impairments.[29] (Tr. 260-62,

292, 295-98, 401-18.)

In sum, Dr. Samson's Medical Source Statement and Psychological Medical Statement were

inconsistent with and not supported by the objective record medical evidence, other medical

evidence in the record, and his treatment notes from September of 2005, to October of 2007, and

from January of 2008, to August of 2009.[30]  Therefore, the ALJ did not err in assigning little weight

to Dr. Samson's Medical Source Statement or to his Psychological Medical Statement.  She focused

on the factors of inconsistency and supportability, provided "good reasons," as required by SSR 96-

---

[29] Drs. Davis, Blazina, O'Bryan, and Kupstas assessed numerous categories describing the plaintiff's mental activities, and in only two categories was the plaintiff found to have a marked impairment. (Tr. 260-62, 292, 295-98, 401-18.) Specifically, Dr. Davis opined that the plaintiff's interpersonal functioning was markedly limited (tr. 260-62) and Dr. O'Bryan concluded that her "ability to act appropriately with the general public" was markedly limited. (Tr. 295-98.)

[30] The plaintiff argues that the ALJ erred in relying on the physical RFC assessments of Dr. Kossman and Dr. Walwyn since Dr. Kossman and Dr. Walwyn were not able to review her entire medical history before completing their physical RFC assessments. Docket Entry No. 12 at 12-14.  Dr. Kossman was not able to consider Dr. Ahsan's treatment note from November of 2007 (tr. 391), and both Dr. Kossman and Dr. Walwyn were not able to consider Dr. Samson's medical findings from January of 2008, to August of 2009 (tr. 420-35), or TMC's medical records from February of 2008, to May of 2009. (Tr. 443-97.)  However, the medical records from Dr. Ahsan, Dr. Samson, and TMC, do not show that the plaintiff's condition worsened after Dr. Kossman and Dr. Walwyn evaluated her physical impairments. (Tr. 391, 420-35, 443-97.)

-27-

2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2)), and there is substantial evidence in the record to support his determination.

### 2. The hypothetical question that the ALJ posed to the VE and relied upon in determining the plaintiff's RFC accurately reflected the plaintiff's mental limitations.[28]

The plaintiff contends that the hypothetical that the ALJ asked the VE to consider did not accurately reflect her mental limitations. Docket Entry No. 12, at 17-22.  Specifically, the plaintiff argues that "the ALJ did not accurately describe the mental limitations assessed by" Dr. Blazina, Dr. O'Bryan, or Dr. Kupstas. *Id.*

The Regulations allow an ALJ to rely on a VE at step five to determine whether a plaintiff is able to perform any work. 20 C.F.R. § 404.1560(c).  The VE's testimony, in response to an ALJ's hypothetical question, will be considered substantial evidence "'only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)). *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky*, 35 F.3d at 1036) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs."); *Colvin v. Barnhart*, 475 F.3d 727, 732 (6th Cir. 2007) (quoting *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir.2001)) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence

---

[28] The Court has addressed the plaintiff's second and third assertions of error together since both focused on the legitimacy of the hypotheticals that the ALJ posed to the VE.

where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments."). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

In this case, in the hypothetical upon which the ALJ relied to make her RFC determination, she asked the VE what type of work the plaintiff could perform if she could lift fifty pounds occasionally and twenty-five pounds frequently; could sit/stand or walk "for up to six hours each in an eight hour work day;" could "occasionally perform all postural activities but never climb ladders, ropes or scaffolds;" "would be limited to short, simple, routine tasks not working with the public and only occasionally working with co-workers;" and should avoid working "around pulmonary irritants and would have to observe seizure precautions as not working around heights, moving machinery or operating motor vehicles." (Tr. 66-67.) The VE answered that the plaintiff could work as a laundry worker, assembler, sorter, and food preparation worker. (Tr. 67.)

Although the ALJ noted that the plaintiff "would be limited to short, simple, routine tasks not working with the public and only occasionally working with co-workers" in her hypothetical to the VE (tr. 66-67), the plaintiff contends that the hypothetical does not account for her "limited ability [] to sustain concentration and persistence, as assessed by Dr. Blazina, whose opinion she intended to give the most weight" or for "several of the restrictions assessed by Drs. O'Bryan and Kupstas." Docket Entry No. 12, at 20. The Court disagrees with the plaintiff's contention. First, the ALJ's hypothetical took into account Dr. Blazina's assigned concentration and persistence limitations. If the plaintiff is limited in her ability to maintain concentration and persistence (tr. 289-

91), it would logically follow that she could only perform short, simple, and routine tasks. (Tr. 66-67.)

Next, the ALJ's hypothetical accurately reflects the limitations assessed by Dr. O'Bryan and Dr. Kupstas. For the most part, Dr. O'Bryan and Dr. Kupstas found the plaintiff to be mildly to moderately impaired by her mental impairments (tr. 295-98, 401-18), but Dr. O'Bryan did conclude that she was markedly limited in her "ability to interact appropriately with the general public" and could not work with the public. (Tr. 295-97.) The ALJ's hypothetical to the VE clearly noted that the plaintiff would be precluded from working with the general public and could "only occasionally" work with co-workers. (Tr. 66-67.) In fact, even though the ALJ had assigned significant weight to Dr. Blazina's findings and she determined that the plaintiff's ability to interact socially was not impaired, the ALJ concluded that Dr. O'Bryan's assessment, to which she had assigned "some" weight, more aptly reflected the plaintiff's limitation and was more consistent with the record. (Tr. 20.) In sum, since the ALJ relied on the VE's answer to a hypothetical that was consistent with and supported by the medical findings of Dr. Blazina, Dr. O'Bryan, and Dr. Kupstas, substantial evidence in the record supports her step five determination that the plaintiff could perform work as a sorter, assembler, laundry worker, and food preparation worker.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with

particularity the specific portions of the Report and Recommendation to which objection is made.

Failure to file written objections within the specified time can be deemed a waiver of the right to

appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*,

474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge